**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| MARK AND LEAH GUSTAFSON, INDIVIDUALLY AND AS ADMINISTRATORS AND PERSONAL REPRESENTATIVES OF THE ESTATE OF JAMES ROBERT ("J.R.") GUSTAFSON | : : : : : : | No. 7 WAP 2023<br><br>Appeal from the Order of the Superior Court entered August 12, 2022, at No. 207 WDA 2019 Reversing the Order of the Court of Common Pleas of Westmoreland County entered January 15, 2019, at No. 1126 of 2018 and Remanding. |
| v. | : : : : | |
| SPRINGFIELD, INC. D/B/A SPRINGFIELD ARMORY AND SALOOM DEPARTMENT STORE AND SALOOM DEPT. STORE, LLC D/B/A SALOOM DEPARTMENT STORE AND THE UNITED STATES OF AMERICA | : : : : : : : : | ARGUED: April 9, 2024 |
| APPEAL OF: SPRINGFIELD, INC. D/B/A SPRINGFIELD ARMORY AND SALOOM DEPARTMENT STORE AND SALOOM DEPT. STORE, LLC D/B/A SALOOM DEPARTMENT STORE | : : : : : : | |

**OPINION**

**JUSTICE MUNDY**                                       **DECIDED: MARCH 31, 2025**

In March 2016, thirteen-year-old J.R. Gustafson tragically died after he was accidentally shot by his fourteen-year-old friend (the Juvenile) at the home of another. After J.R.'s death, his parents, Mark and Leah Gustafson filed the underlying action against Springfield Armory, the manufacturer of the firearm used to shoot J.R., and Saloom Department Store, the retailer that sold the firearm. The trial court sustained preliminary objections filed by Springfield and Saloom (collectively, the Defendants) and

dismissed the Gustafsons' complaint with prejudice. In doing so, the court relied on the federal Protection of Lawful Commerce in Arms Act (PLCAA or the Act), which bars certain civil actions against firearms manufacturers and sellers from being brought in either state or federal court. On appeal, an *en banc* panel of the Superior Court issued a *per curiam* order reversing the trial court's sustaining of preliminary objections and remanding the case for further proceedings. We granted allowance of appeal to address whether the PLCAA operates to bar the Gustafsons' action and, if so, whether the PLCAA is constitutional under the Commerce Clause and the Tenth Amendment of the United States Constitution and principles of federalism. After careful and sober consideration, we answer those questions affirmatively. We therefore reverse the Superior Court's *per curiam* order and affirm the trial court's dismissal of the Gustafsons' action with prejudice.

## I. BACKGROUND

### A. The PLCAA

Necessary to the disposition of this matter is a thorough understanding of the PLCAA. Thus, we begin there. When Congress passed the PLCAA in 2005, it included specific enumerated findings of fact and purposes. Congress found, *inter alia*:

> (3) Lawsuits have been commenced against manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended, which seek money damages and other relief for the harm caused by the misuse of firearms by third parties, including criminals.
>
> (4) The manufacture, importation, possession, sale, and use of firearms and ammunition in the United States are heavily regulated by Federal, State, and local laws. Such Federal laws include the Gun Control Act of 1968, the National Firearms Act, and the Arms Export Control Act.
>
> (5) Businesses in the United States that are engaged in interstate and foreign commerce through the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products that have been shipped or transported in interstate or foreign commerce are not, and should not, be liable for the harm caused by those

who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended.

(6) The possibility of imposing liability on an entire industry for harm that is solely caused by others is an abuse of the legal system, erodes public confidence in our Nation's laws, threatens the diminution of a basic constitutional right and civil liberty, invites the disassembly and destabilization of other industries and economic sectors lawfully competing in the free enterprise system of the United States, and constitutes an unreasonable burden on interstate and foreign commerce of the United States.

(7) The liability actions commenced or contemplated by the Federal Government, States, municipalities, and private interest groups and others are based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States and do not represent a bona fide expansion of the common law. The possible sustaining of these actions by a maverick judicial officer or petit jury would expand civil liability in a manner never contemplated by the framers of the Constitution, by Congress, or by the legislatures of the several States. [ ]

(8) The liability actions commenced or contemplated by the Federal Government, States, municipalities, private interest groups and others attempt to use the judicial branch to circumvent the Legislative branch of government to regulate interstate and foreign commerce through judgements and judicial decrees thereby threatening the Separation of Powers doctrine and weakening and undermining important principles of federalism, State sovereignty and comity between the sister States.

15 U.S.C. § 7901(a)(3)-(8). In light of these findings, Congress set out its specific purposes in passing the PLCAA, including, *inter alia*, to "prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearms products or ammunition products by others when the products functioned as designed and intended[]" and "[t]o prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce." *Id.* at § 7901(b)(1) and (4).

To these ends, the PLCAA bars a "qualified civil liability action" from being brought in either federal or state court. *Id.* at § 7902(a). A "qualified civil liability action" is defined as "a civil action or proceeding or an administrative proceeding brought by any person

against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party[.]" *Id.* at § 7903(5)(A). A "qualified civil liability action," however, does not include:

(i) an action brought against a transferor convicted under section 924(h) of Title 18, or a comparable or identical State felony law, by a party directly harmed by the conduct of which the transferee is so convicted;

(ii) an action brought against a seller for negligent entrustment or negligence *per se*;

(iii) an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought [ ];

(iv) an action for breach of contract or warranty in connection with the purchase of the product;

(v) an action for death, physical injuries or property damage resulting directly from a defect in design or manufacturer of the product, when used as intended or in a reasonably foreseeable manner, except that where the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage; or

(vi) an action or proceeding commenced by the Attorney General to enforce provisions of chapter 44 of Title 18 or chapter 53 of Title 26.

*Id.* at § 7903(5)(A)(i)-(vi). These enumerated subsections are often referred to as the PLCAA's exceptions.

The Act also defines several terms included within the definition of a "qualified civil liability action" that are relevant to our current discussion. Pertinently, the Act defines a "qualified product" as "a firearm … , or ammunition … , or a component part of a firearm or ammunition, that has been shipped or transported in interstate or foreign commerce." *Id.* at § 7903(4). A "manufacturer" is defined as "with respect to a qualified product, a

person who is engaged in the business of manufacturing the product in interstate or foreign commerce and who is licensed to engage in business as such a manufacturer[.]" *Id.* at § 7903(2). A "seller" on the other hand, with respect to a qualified product, is an importer, dealer, or person engaged in the business of selling ammunition, as defined by Title 18, who is engaged in that business in interstate or foreign commerce at the wholesale or retail level. *Id.* at § 7903(6). Lastly, while the PLCAA does not define "criminal misuse" it defines "unlawful misuse" as "conduct that violates a statute, ordinance, or regulation as it relates to the use of a qualified product." *Id.* at § 7903(9).

### B. Factual and Procedural Background

On March 20, 2016, J.R. and the Juvenile were visiting a residence in Mt. Pleasant, Westmoreland County.[1] At some point, the Juvenile came into possession of a semiautomatic handgun (the Firearm), which was manufactured by Springfield and purchased by the Firearm's owner from Saloom. Believing the Firearm was unloaded, as the ammunition magazine had been removed, the Juvenile pulled the Firearm's trigger. Unbeknownst to the Juvenile, however, a live round remained in the chamber and, when the Juvenile pulled the trigger, the live round discharged, killing J.R. As a result of his actions, and upon his admission, the Juvenile was adjudicated delinquent of involuntary manslaughter in juvenile court.

In response to J.R.'s death, his parents Mark and Leah Gustafson (Plaintiffs), in their individual capacity and as the administrators of J.R.'s Estate, filed a complaint against the Defendants pursuant to the Wrongful Death and Survivor Statutes

---

[1] The facts are taken from Plaintiffs' complaint. As the trial court sustained Defendants' preliminary objections in the nature of a demurrer, we must accept Plaintiffs' factual allegations as true for purposes of this appeal. *See Mazur v. Trinity Area Sch. Dist.*, 961 A.2d 96, 101 (Pa. 2008).

(Complaint).[2]  Specifically, Plaintiffs raised products liability claims asserting defective design, negligent design and sale, and negligent warnings and marketing in relation to the Firearm, averring Defendants' actions were the proximate cause of J.R.'s death.

Defendants filed preliminary objections to the Complaint in the nature of a demurrer, seeking dismissal with prejudice pursuant to the PLCAA.  According to Defendants, the Firearm was a qualified product, and the case constituted a qualified civil liability action under the PLCAA because J.R.'s injuries were caused by the Juvenile's unlawful use of the Firearm.  Further, Defendants contended that none of the PLCAA's exceptions applied.  According to Defendants, the only exception that arguably applied was exception (v), otherwise known as the "product defect exception."  *See* 15 U.S.C § 7903(5)(A)(v).  However, Defendants maintained that because the Complaint specifically averred that the Juvenile intentionally pulled the Firearm's trigger shooting and killing J.R., and that the Juvenile was charged with, and adjudicated delinquent of, involuntary manslaughter, the product defect exception was inapplicable.  In other words, the Juvenile's volitional act of pulling the trigger constituted a criminal offense, which, under the exception, is considered the sole proximate cause of J.R.'s injuries and thus, the exception did not apply.  Accordingly, Defendants insisted that the PLCAA barred each of Plaintiffs' causes of actions, requiring the trial court to dismiss the Complaint with prejudice.

Plaintiffs filed a response, asserting the PLCAA did not bar their action.  In particular, they argued that since the PLCAA purports to intrude on a traditional area of state sovereignty, a court must interpret the Act to minimize that intrusion and only find that it bars claims when Congress has made its intent clear by providing a plain statement that certain claims are prohibited.  Plaintiffs insisted that when viewing their action through

---

[2] Complaint at ¶¶ 15 and 16 (relying on 42 Pa.C.S. §§ 8301 and 8302).

this lens, the matter could not be considered a qualified civil liability action because: (1) the harm they alleged was not solely caused by the criminal misuse of a firearm, but was caused, at least in part, by Defendants' own tortious conduct; and (2) the product defect exception should be read expansively to not include juvenile misdeeds as criminal acts. Further, Plaintiffs argued that if the PLCAA barred their claims, the Act itself was unconstitutional because it, *inter alia*, violated both principles of federalism and the Tenth Amendment to the United States Constitution and was not a legitimate exercise of Congress' Commerce Clause authority.[3] Upon learning of the Plaintiffs' constitutional arguments, the United States of America (United States or the government) intervened to defend the PLCAA's constitutionality. After hearing argument, the trial court sustained Defendants' preliminary objections and dismissed Plaintiffs' Complaint with prejudice, finding the PLCAA barred all of Plaintiffs' claims and was constitutional.

Plaintiffs appealed the dismissal to the Superior Court and reasserted both their statutory and constitutional arguments. Initially, a three-judge panel of the court, in a published opinion, held the PLCAA barred Plaintiffs' Complaint. *Gustafson v. Springfield, Inc.*, 207 WDA 2019 (Pa. Super. filed Sept. 28, 2020) (withdrawn). The panel, however, also held the Act unconstitutional, opining that it exceeded Congress' authority under the Commerce Clause and violated the Tenth Amendment. Thus, the intermediate court reversed the trial court's order and remanded the case with directions for the trial court to enter a declaratory judgment in Plaintiffs' favor declaring the PLCAA "repugnant to the constitution of the United States and, therefore, without the force or effect of law." *Id.* at 63.

---

[3] Plaintiffs also argued the PLCAA violated the Due Process and Equal Protection clauses of the Fifth Amendment. This Court did not grant allowance of appeal to address those issues. As such, we will not discuss them further.

Both Defendants and the United States filed applications for reargument *en banc*. The court granted reargument and withdrew the panel's decision. After supplemental briefing, the *en banc* panel issued a *per curiam* order reversing the trial court's order sustaining Defendants' preliminary objections and remanding for further proceedings. *Gustafson v. Springfield, Inc.*, 282 A.3d 739, 740 (Pa. Super. 2022) (*per curiam*). Although five of the nine participating judges authored opinions either in support or dissent of the court's disposition, no single expression or rationale garnered majority support. Rather, three judges concluded the PLCAA barred Plaintiffs' claims but was unconstitutional, *see id.* at 740-57 (Kunselman, J.) (Opinion in support of *Per Curiam* Order to Reverse) (joined by Panella, P.J and Lazarus, J.); one Judge believed the Act both did not bar Plaintiffs' claims and was unconstitutional, *see id.* at 757-62 (Bender, P.J.E) (Opinion in Support of *Per Curiam* Order to Reverse); one Judge thought the PLCAA was constitutional but did not bar Plaintiffs' action, *see id.* at 762 (Dubow, J.) (Opinion in Support of *Per Curiam* Order to Reverse); and four Judges found the Act both barred Plaintiffs' claims and was constitutional, *see id.* at 762-76(Olson, J., dissenting) (joined by Bowes, J. and McCaffery, then J., and Murray, J. concurring in the result); *id.* at 776-89 (Murray, J., dissenting) (joined by Bowes, J., Olson, J. and McCaffery, then J. concurring in the result). Altogether, a five-judge majority voted to reverse, albeit for different reasons – two judges concluded the PLCAA simply did not apply under the facts as alleged in Plaintiffs' Complaint with conflicting opinions as to the constitutionality of PLCAA, while three judges held that, even if the PLCAA barred the Plaintiffs' action, the Act was unconstitutional.

In response to the Superior Court's *per curiam* order and myriad of accompanying opinions, Defendants filed an application to correct, arguing that since a majority of the court found both that the PLCAA barred Plaintiffs' Complaint and was constitutional, the

trial court's order sustaining their preliminary objections should be affirmed, not reversed. The Superior Court denied Defendants' request, stating the *per curiam* order "properly reflect[ed] the votes of the individual judges and their separate writings in directing that the PLCAA does not bar the claims at issue[,]" and "accordingly reflect[ed] only th[e] [c]ourt's majority agreement to reverse the trial court's order, and all reasoning reflected in the writings attached to the [o]rder are *dicta*." *Gustafson v. Springfield, Inc.*, 207 WDA 2019 (Pa. Super. filed August 19, 2022) (*per curiam*).

We granted allowance of appeal to address the following issues:

(1)     Do [Plaintiffs'] claims for damages against the manufacturer and seller of a firearm that was criminally or unlawfully misused by a third party constitute a prohibited qualified civil liability action pursuant to the [PLCAA], 15 U.S.C. §§ 7901-7903 [ ]?

(2)     Do [Plaintiffs'] claims fail to satisfy the product defect exception to the PLCAA when the discharge of the firearm was caused by an intentional trigger pull while the firearm was pointed at another person and resulted in a juvenile delinquency adjudication for involuntary manslaughter?

(3)     Is the PLCAA a permissible exercise of the power of Congress pursuant to Article I, Section 8 of the U.S. Constitution, or does it instead violate the Tenth Amendment and principles of federalism?

*Gustafson v. Springfield, Inc.*, 296 A.3d 560 (Pa. 2023) (order).[4]

---

[4] On October 4, 2024, the Supreme Court granted *certiorari* in *Smith & Wesson Brands v. Estados Unidos Mexicanos*, 145 S.Ct. 116 (2024) (Mem), Docket No. 23-1141, for which the Court held argument on March 4, 2025. There, the Mexican government brought an action against several firearms companies alleging the companies' involvement in illegal trafficking of guns into Mexico, which were then used by Mexican drug cartels. The First Circuit held that the action was a "qualified civil liability action" under the PLCAA but that the action satisfied the predicate exception, 15 U.S.C. § 7903(5)(A)(iii), to the PLCAA's bar. *Estados Unidos Mexicanos v. Smith & Wesson Brands*, 91 F.4th 511 (1st Cir. 2024). The issues the High Court granted *certiorari* on deal with the predicate exception's applicability and do not implicate the issues this Court granted allowance of appeal to review.

As noted, the trial court sustained Defendants' preliminary objections in the nature of a demurrer.  We review that decision under the following well settled standard:

> When an appellate court rules on whether preliminary objections in the nature of a demurrer were properly sustained, the standard of review is *de novo* and the scope of review is plenary.  The court may sustain preliminary objections only when, based on the facts pleaded, it is clear and free from doubt that the complainant will be unable to prove facts legally sufficient to establish a right to relief.  For the purpose of evaluating the legal sufficiency of the challenged pleading, the court must accept as true all well-pleaded, material, and relevant facts alleged in the complaint and every inference that is fairly deducible from those facts.

*Mazur*, 961 A.2d at 101 101 (Pa. 2008) (internal citations omitted).

Based on the claims presently before us, we are tasked with addressing questions of both statutory interpretation and constitutional validity.  We will first consider whether the PLCAA operates to bar Plaintiffs' claims and then address Plaintiffs' constitutional challenges.

## II.  Applicability of the PLCAA

Determining whether the PLCAA bars Plaintiffs' Complaint requires us to interpret the Act, a federal statute.  In this regard, we have previously explained:

> "The construction of a federal statute is a matter of federal law."  *Council 13,* [*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO ex rel. Fillman v. Rendell*,] 986 A.2d [63,] [ ] 80 [(Pa. 2009)].  Pursuant to federal rules of statutory construction, the courts consider the particular statutory language, as well as the design of the statute and its purposes in determining the meaning of a federal statute.  *Id.* (citing *Crandon v. United States*, 494 U.S. 152, 158 (1990)).  But, if the [statute's] language is clear, we should refrain from searching other sources in support of a contrary result.  *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 228[ ] (2008) ("We are not at liberty to rewrite the statute to reflect a meaning we deem more desirable."); *Carter v. United States*, 530 U.S. 255, 271[ ] (2000) (statutory interpretation "begins by examining the text … not by psychoanalyzing those who enacted it"); *United States v. Gonzales*, 520 U.S. 1, 6[ ] (1997) (where "[g]iven [a] straightforward statutory command, there is no reason to resort to legislative history"); *Connecticut Nat'l Bank v. Germain*, 503 U.S 249, 252-54[ ] (1992) ("[I]n interpreting a statute a court should always turn first to one cardinal canon before all others.  We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a

statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"). *Accord Dooner v. DiDonato*, [ ] 971 A.2d 1187, 1195 ([Pa.] 2009) ("The language used by [Congress] is the best indication of its intent.").

*Samuel-Bassett v. Kia Motor Am., Inc.*, 34 A.3d 1, 51 (Pa. 2011).

Further, as the PLCAA bars a qualified civil liability action from being brought in state court per 15 U.S.C. § 7902(a), we are tasked with interpretating statutory provisions that expressly preempt state law. While the preemptive language of the PLCAA "means that we need not go beyond that language to determine whether Congress intended the [federal statute] to pre-empt at least some state law, we must nonetheless identify the domain expressly pre-empted by that language." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996) (internal citation and quotations omitted). In *Medtronic*, the High Court explained that in determining the extent of Congress' intended preemption, courts are guided by two presumptions: (1) the presumption that Congress did not intend to preempt or supersede the state's historic police powers unless that intent is clear and manifest; and (2) the purpose of Congress is the touchstone in every preemption case. *Id.* at 485. However, the Supreme Court has also explained that when a federal statute contains an express preemption clause, courts "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 594 (2011) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). Further, when a Congressional statute contains an express preemption clause, courts "do not invoke any presumption against pre-emption[.]" *Commonwealth of Puerto Rico v. Franklin California Tax-free Trust*, 579 U.S. 115, 125 (2016). Instantly, we find that the PLCAA contains such an express preemption clause, which explicitly preempts state law relative to qualified civil liability actions. *See* 15 U.S.C. § 7902(a). Thus, we do not apply any presumption against preemption and, instead, focus on the PLCAA's plain language.

Plaintiffs, relying on *Gregory v. Ashcroft*, 501 U.S. 452 (1991),[5] and *Bond v. United States*, 572 U.S. 844 (2012),[6] argue that this Court should employ a narrow interpretation of the PLCAA. They assert that the PLCAA intrudes on Pennsylvania's sovereignty in a myriad of ways, which, absent a "plain statement" of Congress' intent to so intrude, requires us "to interpret [the PLCAA] in a way that minimizes [that] intrusion[.]" Plaintiffs' Brief at 22.

Initially, it is important to note that *Gregory* and *Bond* involved *implied* preemption statutes, as opposed to the PLCAA's *express* preemption. *See Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 323 (Mo. 2016). Accordingly, other courts, such as the Supreme Court of Missouri, have found that *Gregory* and *Bond* are inapplicable to an analysis of

---

[5] In *Gregory*, state court judges brought a challenge under the federal Age Discrimination in Employment Act (ADEA) with respect to a mandatory retirement provision of the Missouri Constitution requiring state judges to retire at the age of seventy. In rejecting the judges' ADEA claim, the United States Supreme Court explained that the authority of states to determine the qualifications of important elected officials is at the heart of a representative government, and such authority is reserved to the states under the Constitution. *Gregory*, 501 U.S. at 463. The Court further invoked the "plain statement" rule, explaining that "'[i]f Congress intends to alter the 'usual constitutional balance between the States and the federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Id.* at 460 (internal citation omitted). The High Court refused to read the ADEA to cover state judges because Congress had not made it clear in the statute that judges were included. *See id.* at 467.

[6] Congress enacted the Chemical Weapons Convention Implementation Act of 1998 (the Chemical Weapons Act) in order to implement the International Convention on the Prohibition of the Development, Production, Stockpiling, and Use of Chemical Weapons and on Their Destruction. In *Bond*, a defendant was convicted of possessing and using a chemical weapon under the Chemical Weapons Act after spreading two toxic chemicals on the car, mailbox, and doorknob of her romantic rival. While the Chemical Weapons Act could be read to include the defendant's conduct, the United States Supreme Court found that Congress was not completely clear that the statute intended to cover purely local minor criminal offenses and concluded reading the statute in such a manner "would mark a dramatic departure from [its] constitutional structure and a serious reallocation of criminal law enforcement authority between the Federal Government and the States." *Bond*, 572 U.S. at 866. As such, the Court found the Chemical Weapons Act did not cover the defendant's actions.

the PLCAA because the Act "expressly and unambiguously preempts state tort law, subject to the enumerated exceptions." *Id.* We agree that *Gregory* and *Bond* are inapplicable to our analysis of the PLCAA because the Act expressly and unambiguously preempts state tort law. *See also Travieso v. Glock Inc.*, 526 F. Supp.3d 533, 541 (D.Ariz. 2021) ("[T]he PLCAA contains a clear statement of Congress's intent to preempt the states."); *Estate of Kim ex rel. Alexander v. Coxe*, 295 P.3d 380, 387-88 (Ak. 2013) ("The PLCAA expressly preempts state common law by requiring that state courts immediately dismiss qualified civil liability actions."). We further agree that "there is no need to employ a narrow construction" when analyzing the PLCAA. *Delana*, 486 S.W.3d at 323*.* As we reject Plaintiffs' contention that we must employ a narrow reading to the PLCAA's preemption clause, our understanding of the scope of that preemption "must rest primarily on a fair understanding of congressional purpose[,]" which is "primarily … discerned from the language of the pre[]emption statute and the statutory framework surrounding it." *Travieso*, 526 F.Supp.3d at 541 (quoting *Medtronic*, 518 U.S. at 485-86) (internal citations and quotations omitted and emphasis removed).

**A. Qualified Civil Liability Action**

As noted, PLCAA bars a "qualified civil liability action" from being brought in state court and defines such an action, subject to specific exceptions discussed more fully below, as:

> a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party[.]

15 U.S.C. § 7903(5)(A). Applying the plain language to the instant matter, Plaintiffs (1) brought a civil action against both a manufacturer and seller, (2) of a qualified product,

(3) for damages, (4) resulting from the criminal or unlawful use of a qualified product by a person or third party, thus seemingly barring their claim under the PLCAA.[7]

However, the crux of Plaintiffs' argument is that Section 7903(5)(A) of the Act does not bar their action because their claims do not "result[ ] from the criminal or unlawful misuse of a qualified product[.]"  Plaintiffs observe that the PLCAA does not define the term "resulting from" and the Court should interpret the term in light of the PLCAA's stated purposes.  Specifically, according to Plaintiffs, Congress intended the PLCAA to bar causes of action "'for the harm **solely caused by** the criminal or unlawful misuse of' a gun [,]" Plaintiffs' Brief at 39 (quoting 15 U.S.C. § 7901(b)(1) (emphasis added by Plaintiffs)), rather than harms caused by a combination of third-party gun misuse and gun company conduct, such as that which led to J.R.'s death.  *Id.* at 41.  Plaintiffs argue that an interpretation of Section 7903(5)(A) that would bar causes of action where the harm was caused by a combination of third-party criminal misuse of a firearm and gun company actions would ignore the phrase "solely caused by" in Section 7901(b)(1) and violate rules of statutory construction requiring courts to give effect to all provisions of a statute.  *Id.* at 40 (citing *Bernier v. Bernier*, 147 U.S. 242, 246 (1893)).  Plaintiffs further contend that reading Section 7903(5)(A) consistently with Section 7901(b)(1) accomplishes Congress' stated intent to prohibit theories of liability "without foundation."  *Id.* at 41 (quoting 15 U.S. § 7901(a)(7)).  Plaintiffs also reiterate their position that *Bond* and *Gregory* mandate their interpretation.[8]

---

[7] Plaintiffs do not contest that Defendants qualify as either manufacturers or sellers under the PLCAA or that the Firearm is a qualified product.

[8] Plaintiffs additionally argue that federalism mandates the Court adopt their position.  We address Plaintiffs' federalism concerns later in our discussion of the PLCAA's constitutionality.

In response, Defendants counter that the facts and circumstances of this case clearly satisfy each of the required elements of a "qualified civil liability action." Specifically, as to Section 7903(5)(A)'s requirement that damages "result[ ] from the criminal or unlawful misuse of a qualified product[,]" Defendants assert Plaintiffs' injuries arise entirely from the Juvenile's independent criminal acts. Defendants' Brief at 17. Defendants observe the Juvenile was adjudicated delinquent of involuntary manslaughter for his actions resulting in J.R.'s death and that, under Pennsylvania law, a delinquent act includes "an act designated a crime under the law of this Commonwealth, or of another state if the act occurred in that state, or under Federal law[.]" *Id.* at 17-18 (quoting 42 Pa.C.S. § 6302) (emphasis removed)). In Defendants' view, the Juvenile's adjudication "conclusively establishes that Plaintiffs' claims are based on the criminal misuse of the [Firearm] by a third party[,]" *id.* at 19, and the action is thus a "qualified civil liability action" pursuant to the PLCAA.[9] The United States does not take a position on whether the PLCAA bars Plaintiffs' claims but, as discussed *infra*, only advocates in support of the PLCAA's constitutionality.[10]

---

[9] After the Court held oral argument, Defendants filed a request entitled "Application Under PA.R.A.P. 2501(a)" (Application) in order to bring the opinion from the Rhode Island District Court in *Santos v. City of Providence*, 2024 WL 1198275 (D.R.I. Mar. 20, 2024), to the Court's attention. Neither Plaintiffs nor the United States have filed a response to the Application. The Application is granted.

[10] Numerous *amici* have also filed briefs in support of the parties. The Commonwealth of Pennsylvania, through the Office of the Attorney General, Federalism Scholars, the Pennsylvania Association for Justice, and Everytown for Gun Safety Support Fund filed briefs in support of Plaintiffs. The State of Montana, joined by nineteen other states, the Philadelphia Association of Defense Counsel and the Pennsylvania Defense Institute, and The National Shooting Sports Foundation, Inc. have filed briefs in support of Defendants.

Initially, we find Plaintiffs' reliance on the PLCAA's purpose section, Section 7901(b)(1), in an attempt to narrow the Act's preemptive language, unpersuasive. Addressing an identical argument, the District Court of Arizona stated:

> While instructive, a statute's purposes section cannot control over the law's express terms. Preambles and prefatory language, such as the findings and purposes section of the PLCAA, are valid sources for determining congressional intent. ANTONIN SCALIA & BRYAN A GARDNER, READING LAW 167-70 (2012). However, these sources are used to resolve ambiguities, not to create them, and it is well established that the purposes section of a statute will not control in the face of clear enacting provisions. *Jogi v. Voges*, 480 F.3d 822, 834 (7th Cir. 2007) (citing cases); *see also H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 245[ ] (1989); 2A SUTHERLAND, STATUTES AND STATUTORY CONSTRUCTION § 47.04, at 146 (5th ed. 1992, Norman Singer ed.). In the present case, the language of the PLCAA's enacting provisions clearly shows Congress intended to preempt a broader scope of actions than those suggested by the Plaintiff. As such, the recitation of the phrase "solely caused" in the purposes section will not control the Court's analysis.

*Travieso*, 526 F.Supp.3d at 543. *See also Estate of Kim*, 295 P.3d at 386-87 ("[A] statutory preamble can neither restrain nor extend the meaning of an unambiguous statute; nor can it be used to create doubt or uncertainty which does not otherwise exist. The [plaintiff's] construction would elevate the PLCAA's preamble over the substantive portion's clear language." (internal citations and quotations omitted)); *Delana*, 486 S.W.3d at 322 ("The general statement of the purpose of the PLCAA does not redefine the plain language of a statute. Therefore, the statement of purpose does not overcome the fact that the specific substantive provisions of the PLCAA expressly preempts all qualified civil liability actions against firearms sellers, including claims of negligence." (internal citations omitted)). In line with courts that have previously considered the issue, we agree that the PLCAA's purpose section could be helpful in resolving any ambiguity in the Act's operative language. However, we find that the PLCAA's definition of a "qualified civil liability action" as an action seeking damages "resulting from the criminal or unlawful misuse of a qualified product by the person or a third party[,]" contains no such ambiguity

and clearly evinces Congress's intent to preempt a broader scope of actions than those suggested by Plaintiffs. To wit, if Congress intended to limit the Act's bar on qualified civil liability actions to those "solely caused by the criminal or unlawful misuse of firearms products[,]" it could have used that language in Section 7309(5)(A). Stated differently, Congress's failure to employ such limiting language indicates its intent for the Act to encompass a wider range of civil actions. *See Clay v. United States*, 537 U.S. 522, 528 (2003) ("When Congress includes particular language in one section of a statute but omits it in another section of the same Act, we have recognized, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusions or exclusion.") (internal quotations and citations omitted).

Our conclusion is further supported by the fact that Plaintiffs' interpretation would render several of the PLCAA's exceptions superfluous. *See Travieso*, 526 F.Supp.3d at 543. For example, as to exception (iii), Section 7903(5)(A)(iii), known as the "predicate exception,"[11] "if [the] PLCAA preemption never covered cases alleging any wrongful conduct by a manufacturer, then the exception allowing actions for a seller's knowing violation of State or Federal gun laws would be completely unneeded." *Id.* The same conclusion applies to the "product liability exception", which is particularly relevant here. This exception states that "where the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act *shall be considered the sole proximate cause* of any harm." 15 U.S.C. § 7903(5)(A)(v) (emphasis added). Plaintiffs' position that the PLCAA only covers actions where the harm was solely caused by a third-party bad actor would render the product liability exception's limitation of proximate cause

---

[11] Exception (iii) "has come to be known as the 'predicate exception' because a plaintiff not only must present a cognizable claim, he or she also must allege a knowing violation of a 'predicate statute.'" *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1132 (9th Cir.2009) (citing, *inter alia*, *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 390 (2d Cir.2009)).

absolutely meaningless. *See id.* at 543-44. Thus, we decline Plaintiffs' invitation to graft the limiting language "solely caused" contained in the PLCAA's purpose section onto the Act's broader definition of a "qualified civil liability action."

As to whether Plaintiffs' alleged harm "result[ed] from the criminal or unlawful misuse of a qualified product[,]" 15 U.S.C. § 7903(5)(A), we find the Illinois State Supreme Court's decision in *Adames v. Sheahan*, 909 N.E.2d 742 (Ill. 2009), with facts strikingly similar to those in the case *sub judice*, to be particularly instructive. In that case, a thirteen-year-old boy (the shooter) came into possession of firearms owned by his father. *Adames*, 909 N.E.2d at 745. The shooter showed the firearms to his friend (the victim) and the boys started playing around with the weapons. *Id.* at 746. At some point, the shooter removed the magazine from one of the firearms and placed it in his pocket. *Id.* Then, believing the firearm was unloaded because he had removed the magazine, the shooter pointed the firearm at the victim and pulled the trigger, discharging the gun and shooting the victim. *Id.* The victim died as a result of his injuries and the shooter was later found delinquent of*, inter alia,* involuntary manslaughter. *Id.*

The victim's estate (the Estate) filed suit against, *inter alia*, Beretta U.S.A. Corporation (Beretta), the manufacturer of the firearm, raising claims for product liability design defect, negligent design, failure to warn, and breach of the implied warranty of merchantability. *Id.* at 751. After the PLCAA was implicated, the Estate argued that its action was not a qualified civil liability action because the alleged harm did not "result[ ] from the criminal or unlawful misuse of a qualified product." *Id.* at 760. Relying on the PLCAA's definition of "unlawful misuse," the Illinois Supreme Court rejected the Estate's argument, determining that "[the shooter's] use of the [firearm] … certainly violated the Criminal Code, a statute, when he was adjudicated delinquent for involuntary manslaughter and reckless discharge of a firearm, satisfying the definition of 'unlawful

misuse.'" *Id.* 761. Further, relying on Black's Law Dictionary's definition of "criminal" as an adjective, the court found that the shooter's misuse of the firearm also "had the character of a crime and 'in the nature of a crime' and, therefore, was a criminal misuse." *Id.*

In reaching these determinations, the Illinois Supreme Court rejected the Estate's argument that it should not look to the shooter's juvenile adjudication in determining whether there was an unlawful or criminal misuse because the shooter had not been convicted of anything and lacked criminal intent. The court observed that the PLCAA does not require a criminal conviction or criminal intent. Rather, it merely requires criminal or unlawful misuse. *Id.* In fact, the court noted that Congress did require a conviction in order for an exception to the PLCAA to apply under Section 7903(5)(A)(i). *Id.* at 761-62 (citing 15 U.S.C. § 7903(5)(A)(i) ("an action brought against a transferor convicted under section 924(h) of Title 18, or a comparable or identical State felony law, by a party directly harmed by the conduct of which the transferee is so convicted[.]")). The court found that when Congress includes particular language in one section of a statute but omits it from another section of the same act, courts may presume Congress acted intentionally and purposely in that exclusion. *Id.* at 762 (citing *Clay*, 537 U.S. at 528).

Similar to *Adames*, in the case *sub judice*, the Juvenile was adjudicated delinquent in juvenile court of involuntary homicide for his actions related to the shooting of J.R. Under the Juvenile Act, 42 Pa.C.S. §§ 6301-6375, a "delinquent act" is defined as, absent certain exceptions not relevant here, "an act designated a crime under the law of this Commonwealth, or of another state if the act occurred in that state, or under Federal Law[.]" 42 Pa.C.S. § 6302. Pursuant to the Crimes Code, "[a] person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly

negligent manner, he causes the death of another person." 18 Pa.C.S. § 2504(a). In order to adjudicate a child delinquent, the court must find the child committed the delinquent act by proof beyond a reasonable doubt. *See* 42 Pa.C.S. § 6341(b). As such, the Juvenile's adjudication for involuntary manslaughter is proof beyond a reasonable doubt that, through his reckless or grossly negligent actions in shooting J.R. with the Firearm, he caused J.R.'s death, in violation of the criminal law of this Commonwealth.

The PLCAA defines "unlawful misuse" as "conduct that violates a statute, ordinance, or regulation as it relates to the use of a qualified product." 15 U.S.C. § 7903(9). The Juvenile's adjudication for involuntary manslaughter is proof beyond a reasonable doubt that he violated a statute related to his use of the Firearm, which all parties concede is a "qualified product." In this regard, we concur with the Illinois Supreme Court's conclusion in *Adames* that a juvenile adjudication clearly satisfies the PLCAA's definition of "unlawful misuse." *Adames*, 909 N.E.2d at 761.

That said, the PLCAA does not define "criminal misuse." Thus, as the Illinois Supreme Court did in *Adames*, we consult Black's Law Dictionary (Black's). *See Commonwealth v. Gamby*, 283 A.3d 298, 307 (Pa. 2022) ("To discern the legislative meaning of words and phrases, our Court has on numerous occasions engaged in an examination of dictionary definitions.") (internal citations omitted). "Criminal" in Section 7903(5)(A) of the Act is used as an adjective and Black's defines "criminal" in its adjective form as, "1. Of, relating to, or involving a crime; in the nature of a crime… 2. Of, relating to, or involving the part of the legal system that is concerned with crime; connected with the administration of penal justice … 3. Wrong, dishonest, and unacceptable." CRIMINAL, Black's Law Dictionary (12th ed. 2024). Further, under Section 6302 of the Juvenile Act, a delinquent act is "an act designated a crime under the law of this Commonwealth[.]" 42 Pa.C.S. § 6302. As the Juvenile was adjudicated of involuntary

manslaughter for shooting J.R., we conclude his actions were "[o]f, relating to, or involving a crime[,]" and "in the nature of a crime[,]" and constituted "criminal" misuse of a qualified product under the PLCAA. *See* Blacks*, supra.*

In reaching this conclusion, we find the fact that the Juvenile was not convicted of a criminal offense immaterial to our analysis. As stated *supra*, the plain language of Section 7903(5)(A) does not require a criminal conviction. *See* 15 U.S.C. § 7903(5)(A) (defining a "qualified civil liability action" as an action seeking damages "**resulting from the criminal or unlawful misuse of a qualified product** by the person or a third party[.]" (emphasis added)). Like the Illinois Supreme Court recognized in *Adames*, Congress's failure to require a criminal conviction in Section 7903(5)(A) contrasts with its inclusion of a criminal conviction requirement elsewhere in the PLCAA, and

> because Congress specifically included language requiring a conviction in [S]ection 7903(5)(A)(i), but did not include such language in [S]ection 7903(5)(A), we presume that Congress did not intend criminal misuse to require proof of a criminal conviction.

*Adames*, 909 N.E.2d at 762. As such, we conclude that an underlying criminal conviction is not required for an action to meet the PLCAA's definition of a "qualified civil liability action." *See also, e.g.*, *Delana*, 486 S.W.3d at 321 ("PLCAA preemption is based on 'criminal or unlawful misuse' and not the existence of a criminal conviction."); *Ryan v. Hughes-Ortiz*, 959 N.E.2d 1000, 1008 (Mass. App. Ct. 2012) ("[T]he PLCAA does not require a criminal conviction in order for an activity to qualify as 'criminal or unlawful misuse.'").

We acknowledge that Plaintiffs argue that this interpretation renders the phrase "unlawful misuse" meaningless surplusage. Plaintiffs' Brief at 31. We disagree, as such an assertion ignores the PLCAA's definition of "unlawful misuse," which requires "conduct that violates a statute, ordinance, or regulation as it relates to the use of a qualified product." 15 U.S.C. § 7903(9). Actions can satisfy this definition even if the law they

violate is purely civil in nature. As discussed above, however, criminal misuse requires actions that are "[o]f, relating to, or involving a crime[,]" and "in the nature of a crime[.]" Black's, *supra*. One can violate a civil statute, ordinance, or regulation, through actions that are not criminal in nature. Under the PLCAA, those actions would qualify as "unlawful misuse" but not "criminal misuse."

Based on the above analysis, we conclude that Plaintiffs' alleged harm resulted from the Juvenile's "criminal or unlawful misuse" of the Firearm and, as such, their action constitutes a "qualified civil liability action" pursuant to the PLCAA, unless one of the Act's enumerated exceptions is found to apply.

## B. The Product Liability Exception

The PLCAA commands courts to dismiss actions that satisfy the definition of a "qualified civil liability action." However, otherwise-prohibited qualified civil liability actions "shall not include" any action that satisfies any of the PLCAA's six exceptions as set forth in 15 U.S.C. §§ 7903(5)(A)(i)-(vi). Plaintiffs assert their action satisfies the "product liability exception" in Section 7903(5)(A)(v), which exempts from the definition of "qualified civil liability actions:"

> [A]n action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner, except that where the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death personal injuries or property damage[.]

15 U.S.C. § 7903(5)(A)(v). Here, the parties do not contest that Plaintiffs' Complaint is "an action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner[.]" *See* Plaintiffs' Brief at 28; Defendants' Brief at 20-29 (only arguing the "exception to the exception" renders the product liability exception inapplicable). The issue therefore is whether Plaintiffs' claim falls into the "exception to the exception," *i.e.*,

whether the "discharge of the [Firearm] was caused by a volitional act that constituted a criminal offense[.]" 15 U.S.C. § 7903(5)(A)(v). Plaintiffs insist the requirements of the exception to the exception are not met because the discharge of the Firearm was neither a "volitional act" nor a "criminal offense."

### i. Criminal Offense

Plaintiffs assert that while the Juvenile's actions may be considered a juvenile offense, they do not constitute a "criminal offense" under the PLCAA. First, they insist the natural meaning of the phrase "criminal offense" is "conduct actionable in the criminal justice system." Plaintiffs' Brief at 28. According to Plaintiffs, in Pennsylvania "juvenile proceedings are not criminal proceedings[,]" *id.* at 29 (quoting *In re S.A.S.,* 839 A.2d 1106, 1106 (Pa. Super. 2003)), and under the Juvenile Act, juveniles are not charged with crimes but rather with committing delinquent acts. *Id.* (citing *In re R.A.,* 761 A.2d 1220, 1224 (Pa. Super. 2000)). Further, Plaintiffs argue the PLCAA's text suggests that Congress did not intend for juvenile offenses to be considered criminal offenses, as Congress did not expressly include juvenile offenses in the product liability exception. In the Plaintiffs' view, "Congress's failure to mention 'juvenile offenses' indicates that Congress likely intended 'criminal offense' to have a narrower meaning than any acts that could conceivably be subjected to criminal law." *Id.* at 30. Lastly, again relying on *Gregory*, *supra*, Plaintiffs argue that Congress has not made it clear that juvenile offenses are included within the meaning of "criminal offense" and the Court should settle any ambiguity in the Act in their favor. *Id.* at 32.

Citing *Adames, Travieso,* and *Ryan*, Defendants counter that the "PLCAA's focus with respect to the product defect exception is whether the volitional act that caused the discharge of the firearm constituted a criminal offense, not on whether the person committing such act was, or could be, charged with a criminal offense." Defendants' Brief

at 28 (emphasis omitted).  In the case *sub judice*, Defendants assert the Juvenile engaged in a volitional act at the time he shot J.R. that constituted the criminal offense of involuntary manslaughter.  *Id.*  As such, they contend the exception to the exception applies to bar Plaintiffs' claims.

To reiterate, in this case, the Juvenile was adjudicated delinquent for his actions in shooting J.R.  Under the Juvenile Act, that adjudication is proof beyond a reasonable doubt the Juvenile committed "an act designated a crime under the law of this Commonwealth," 42 Pa.C.S. § 6302, specifically involuntary manslaughter.  *See* 42 Pa.C.S. § 6341(b) ("If the court finds on proof beyond a reasonable doubt that the child committed the acts by reason of which he is alleged to be delinquent it shall enter such finding on the record and shall specify the particular offenses, including the grading and counts thereof which the child is found to have committed.").  Even though the Juvenile was charged under the Juvenile Act rather than through the criminal division, that does not change the fact that his actions constituted the crime of involuntary manslaughter as set forth in the Crimes Code.

As further example, consider the disposition in *Travieso*.  In that case, the district court addressed the application of the product liability exception as it pertained to an action initiated after a fourteen-year-old girl shot and severely injured another, but did not face charges in either juvenile or criminal court.  In *Travieso*, the court found:

> the PLCAA's product liability preemption is triggered by the criminal nature of the act, not whether the actor is or can be charged with the crime.  Here, even if a juvenile shooter would not face a criminal conviction, the finding of delinquency would be based on an admittedly criminal act.  As such, the [c]ourt is convinced that **regardless of whether the [s]hooter would face criminal charges, the criminal nature of the act triggers the PLCAA's preemption.**

*Travieso*, 526 F.Supp.3d at 547 (internal citations omitted) (emphasis added).  We agree with the *Travieso* court that the exception to the exception is triggered by the criminal

nature of the act rather than whether the shooter faced or could have faced criminal prosecution. As such, we determine that the phrase "criminal offense" in the product liability exception includes actions by juveniles that constitute "an act designated a crime under the law of this Commonwealth[.]"[12]

### ii. Volitional Act

Plaintiffs also argue that the Juvenile's shooting of J.R. was not a volitional act but rather an "unintentional discharge of a gun thought to be incapable of discharging[.]" Plaintiffs' brief at 33 (citing *Gustafson*, 282 A.3d at 760 (Bender, P.J.E., concurring)). Relying on various dictionary definitions and prior Superior Court cases, Plaintiffs assert the term volitional connotes some form of intent. *Id.* at 34 (citing, *inter alia*, *Commonwealth v. Brumbaugh*, 932 A.2d 108, 111 (Pa. Super. 2007) ("volitional" used in relation to "knowingly made"); *Commonwealth v. Feeney*, 101 A.3d 830, 834 (Pa. Super. 2014) ("volitional" used in relation to "deliberate")). As used in the PLCAA, Plaintiffs assert

---

[12] We further observe that under certain circumstances a juvenile who is accused of committing a delinquent act can face criminal prosecution. Pursuant to Section 6355 of the Juvenile Act "[a]fter a petition has been filed alleging delinquency based on conduct which is designated a crime or public offense under the laws … of this Commonwealth, the court … may rule that [the Juvenile Act] is not applicable and that the offense should be prosecuted, and transfer the offense, where appropriate, to the division or a judge of the court assigned to conduct criminal proceedings, for prosecution of the offense if" certain specific conditions exist. 42 Pa.C.S. § 6355(a). In those circumstances, under Plaintiffs' interpretation of the exception to the exception, whether the PLCAA bars an action would depend on a judge's decision whether or not to transfer a juvenile offender's case to criminal court. If the judge transfers the case, the PLCAA would bar a plaintiff's action. However, under Plaintiffs' interpretation, if a judge declines to transfer the case, the PLCAA would not bar the action. To hinge the applicability of the PLCAA's preemption on a trial judge's decision whether or not to transfer a juvenile offender's case to criminal court would be contrary to Congress's stated intent of barring "qualified civil liability action[s]" from being brought in either Federal or State court. *See* 15 U.S.C. § 7902(a). *Accord Travieso¸* 526 F.Supp.3d at 547 ("While the decision whether to charge the [s]hooter as an adult is discretionary, the [c]ourt cannot believe that the PLCAA's preemption hinges on whether the state actually exercises this discretion of how to charge a shooter. To hinge the effect of the PLCAA on a state's discretionary choice would be contrary to Congress's purpose.").

volitional "logically includes some level of decision or choice to discharge the gun, at a minimum." *Id.* They argue here the Juvenile "did not decide, or intend, or make a choice to discharge" the Firearm as he thought it was unloaded and "incapable of discharging a round." *Id.* at 34-35. According to Plaintiffs, this interpretation is in line with Congress's intent and any alternative understanding would conflate "criminal offense" and "volitional act" and render "volitional act" superfluous. At a minimum, Plaintiffs contend the question of whether the Firearm's discharge was caused by a volitional act is a jury question.

Defendants counter, citing Judge Murray's dissenting opinion below, that whether the Juvenile intended to shoot J.R. is irrelevant, as the PLCAA's requirement of a volitional act "includes no *mens rea* requirement and does not reference an actor's acuity or state of mind[.]" Defendants' Brief at 28. According to Defendants, the Juvenile committed a volitional act by pointing the Firearm at J.R. and intentionally pulling the trigger. As such, they contend the exception to the exception applies and Plaintiffs' action is not permitted under the product liability exception.

"Volitional" is not defined in the PLCAA, but Black's defines "volition" as "**1.** The ability to make a choice or determine something. **2.** The act of making a choice or determining something. **3.** The choice or determination that someone makes. – volitional, *adj.*" VOLITION, Black's Law Dictionary (12th ed. 2024). We reject Plaintiffs' argument that because the Juvenile did not intend to shoot J.R., or to discharge the Firearm at all, his actions were therefore not volitional. We find the key question is not whether the Juvenile made a "choice or determination" to shoot J.R. but rather whether he made "a choice or determination" that caused the discharge of the Firearm which constituted a criminal offense. This interpretation is in line with the plain language of the product liability exception, which does not mention the shooter's intent to shoot an individual or that a shooter intended the consequences of his actions. The only requirement is that the

"volitional act" or the "choice or determination" caused the discharge of the firearm and constituted a criminal offense. *See* 15 U.S.C. § 7309(5)(A)(v) ("where the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage[.]"). The volitional act at issue here, or the choice or determination the Juvenile made, was to pull the trigger. As discussed fully above, this choice or determination constituted the criminal offense of involuntary manslaughter, for which the Juvenile was adjudicated delinquent. Further, the Juvenile's choice to pull the trigger clearly caused the discharge of the Firearm.[13] It is of no moment that the Juvenile did not intend to shoot J.R. Stated differently, what brings Plaintiffs' claim within the exception to the exception is the Juvenile's choice or determination to pull the trigger, not his intent behind the action.

Our interpretation is consistent with that of other courts that have addressed the product liability exception. For example, the *Adames* court determined that the juvenile chose and determined to point the gun at the victim and pull the trigger. *Adames*, 909

---

[13] The direct link between the Juvenile's volitional act of pulling the Firearm's trigger and J.R.'s death makes this case readily distinguishable from *Chavez v. Glock, Inc.*, 207 Cal.App.4th 1283, 144 Cal.Rptr.3d, 236, 353 (2012). There a father stored his firearm in his vehicle in a manner that allegedly violated California penal statutes. Then, while he was driving, the father's three-year-old son gained possession of the firearm and shot father in the back, severely injuring the father. Father filed suit against, *inter alia*, the firearm's manufacturer raising product liability claims. The manufacturer filed for summary judgment based on the PLCAA. In addressing the exception to the exception, the appellate court found that "[b]y specifically linking the actual act of discharge to the criminal offense, as it did," Congress did not intend "to allow any unlawful act in the causal chain, however remote from the actual firing of the weapon, to defeat the exclusion." *Chavez*, 207 Cal.App.4th at 1318. The father's alleged criminal offense of improperly storing the firearm was far removed from the firearm's discharge. The Juvenile's volitional act and criminal offense of pulling the Firearm's trigger here was the direct cause of the Firearm's discharge.

N.E.2d at 763. Accordingly, even though the juvenile did not intend the consequences of his actions, his act was nonetheless a volitional act. *Id.*

The *Travieso* court came to a similar conclusion when it determined that the mere fact that the shooter did not intend to shoot the victim or fire the gun did not mean that the shooter did not act volitionally. *Travieso*, 526 F.Supp.3d at 548. That court found that the shooter took numerous actions, including taking possession of the firearm, pointing the firearm at another individual, and pulling the trigger that constituted volitional actions. *Id.* Similarly, in *Ryan*, the court determined that the volitional act that caused the firearm's discharge was the individual's unlawful possession of the firearm, thus bringing the case under the auspices of the PLCAA. *Ryan*, 959 N.E.2d at 1008-09.

Based on the above analysis, we determine that the product liability exception does not exempt Plaintiffs' Complaint from the PLCAA's definition of a "qualified civil liability action." The PLCAA, therefore, bars Plaintiffs' Complaint.

## III. Constitutionality of the PLCAA

With our determination that Plaintiffs' action is barred by the PLCAA, we now turn to Plaintiffs' constitutional challenges. Plaintiffs argue the PLCAA is not a valid exercise of Congress's Commerce Clause authority under Article I, § 8 of the Constitution and violates the Constitution's Tenth Amendment, as well as general principles of federalism. As the United States Supreme Court has observed, "[d]ue respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *U.S. v. Morrison*, 529 U.S. 598, 607 (2000). "With this presumption of constitutionality in mind," *id.*, we will now address Petitioners' constitutional challenges in turn.

### A. The Commerce Clause

The Commerce Clause gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST Art. I, § 8, cl. 3. The Supreme Court has identified three broad categories of activity the Commerce Clause gives Congress authority to regulate: (1) "the use of the channels of interstate commerce[;]" (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities[;]" and (3) "the power to regulate those activities having substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce." *U.S. v. Lopez*, 514 U.S. 549, 558-559 (1995) (internal citations omitted). As the PLCAA clearly does not fall within the first two categories, we narrow our inquiry to whether the Act regulates activities that "substantially affect interstate commerce."

Plaintiffs argue the PLCAA is not authorized by the Commerce Clause because it does not regulate commerce, but instead regulates states. In this vein, Plaintiffs reject as immaterial Congress's statement that the qualified civil liability actions have a substantial impact on interstate commerce. They assert that simply because Congress says a particular activity substantially affects interstate commerce does not necessarily make it so and the final determination of whether an activity sufficiently affects interstate commerce is a judicial, not a legislative, one. Plaintiffs' Brief at 64-65 (citing *Lopez*, 514 U.S. at 557 n.2). According to Plaintiffs, the Supreme Court has explained that in every case where it has sustained federal regulation on the basis of its indirect effect on commerce, the regulated activity was of an apparent commercial character.

Plaintiffs compare the PLCAA to the individual mandate in the Affordable Care Act (ACA), which the High Court addressed in *National Federation of Independent Businesses v. Sebelius*, 567 U.S. 519 (2012). There, according to Plaintiffs, the Court held that Congress's power to regulate commerce presupposes the existence of

commercial activity and, notwithstanding the individual mandate's effect on interstate commerce, it was impermissible under the Commerce Clause because it did not regulate existing commercial activity. Plaintiffs' Brief at 62 (citing *Sebelius*, 567 U.S. at 552 (opinion by Roberts, C.J.)). In Plaintiffs' view, the PLCAA suffers from similar flaws as they contend the PLCAA does not regulate the firearms industry or the conduct of firearms companies or the sale, possession or use of firearms or individuals in any manner. Rather, they contend the Act regulates states by prohibiting them from enforcing their common law as compared to their statutory laws. *Id.* at 63-64. As such, Plaintiffs assert the PLCAA does not regulate lawsuits affecting interstate commerce but rather "lawsuits that do not emanate from Congress's preferred source within the state." *Id.* at 64. In light of these arguments, Plaintiffs assert that the PLCAA is not an authorized exercise of Congress's Commerce Clause authority and courts that have found otherwise were incorrect.

Defendants counter Congress found that lawsuits against the firearms industry were "an unreasonable burden on interstate and foreign commerce[,]" Defendants' Brief at 32 (quoting 15 U.S.C. § 7901(a)(6)), and that one of the PLCAA's stated purposes is to prevent or alleviate such burdens. *See id.* at 33 (quoting 15 U.S.C. § 7901(b)(4)). According to Defendants, in order to ensure the PLCAA would not exceed its Commerce Clause authority, Congress specifically limited the Act's applicability to those manufacturers and sellers engaged in interstate commerce. *Id.* (citing 15 U.S.C. § 7903(2), (4), (6)). In Defendants' view, "there can be no question of the interstate character of the [firearms industry] and Congress rationally perceived a substantial effect on the industry of the litigation that the Act seeks to curtail." *Id.* at 35 (quoting *City of New York v. Berretta U.S.A. Corp.,* 524 F.3d 384, 395 (2d. Cir 2008)). Defendants further observe that the highest courts of several other states have previously concluded the

PLCAA is authorized under Congress's Commerce Clause authority and implore this Court to find the same.

The United States concurs with Defendants' analysis of the PLCAA's purpose and impact on interstate commerce. The government further rejects Plaintiffs' assertion that the Act does not regulate private conduct, observing that the PLCAA preempts select suits "brought by *any person* against a manufacturer or seller of a qualified product[.]" United States' Brief at 14 (quoting 15 U.S.C. § 7903(5)(a) (emphasis provided by United States)). In addition, the United States rejects Plaintiffs' reliance on *Sebelius* because, unlike the ACA's individual mandate, the PLCAA does not force anyone to engage in commerce, and it only reaches suits that have an explicit connection to or effect on interstate commerce. *Id.* at 16.

While this is an issue of first impression for this Court, and the Supreme Court has not addressed the PLCAA's constitutionality, numerous other courts have addressed the question of whether the PLCAA falls within Congress's Commerce Clause authority. The first court to do so was the Second Circuit in *City of New York*, which found that the PLCAA did not exceed Congress's Commerce Clause authority "where there can be no question of the interstate character of the industry in question and where Congress rationally perceived a substantial effect on the industry of the litigation that the Act seeks to curtail." *City of New York*, 524 F.3d at 395. Numerous other appellate courts have subsequently agreed with the Second Circuit's conclusion. *See Ileto v. Glock, Inc.*, 565 F.3d 1126, 1140 (9th Cir 2009) ("Congress carefully constrained the Act's reach to the confines of the Commerce Clause."); *Adames, supra*, 909 N.E.2d at 765 (agreeing with *City of New York*); *Delana*, 486 S.W.3d at 323 (the PLCAA preempts state tort law "pursuant to Congress's constitutional power to regulate interstate commerce."). After

careful consideration, we concur that Congress's Commerce Clause powers permitted it to enact PLCAA.

In reaching this conclusion, we reiterate that in enacting the PLCAA, Congress made several factual findings. Of particular significance, Congress found that lawsuits had been filed against firearms companies operating in interstate and international commerce "for harm caused by the misuse of firearms by third parties, including criminals[,]" and that firearms companies engaged in interstate and international commerce should not be held liable for such harm. 15 U.S.C. § 7901(a)(3), (5). Congress further explicitly found that imposing such liability on the firearms industry "constitutes an unreasonable burden on interstate and foreign commerce of the United States." *Id.* at § 7901(a)(6). The existence of congressional findings, however, "is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation." *Morrison*, 529 U.S. at 614. "Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Lopez*, 514 U.S. at 557 n.2 (internal quotation marks and citations omitted). Rather, "[w]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question[.]" *Id.* (internal citations omitted). That being the case, the Supreme Court also stated that

> [w]hile Congress normally is not required to make formal findings as to the substantial burden that an activity has on interstate commerce, the existence of such findings may enable us to evaluate the legislative judgment that the activity in question substantially affects interstate commerce, even though no such substantial effect is visible to the naked eye.

*Morrison*, 529 U.S. at 613 (internal quotation marks, citations, and brackets omitted). Further, we are not required to determine if a regulated activity actually has a substantial effect on interstate commerce, but only "whether a 'rational basis' exists for so

concluding." *Gonzales v. Raich*, 545 U.S. 1, 22 (2005) (citing *Lopez*, 514 U.S. at 557; *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 276-80 (1981)).

The facts of the instant matter make clear that the interstate nature of the firearms industry cannot be disputed. Defendant Springfield, who designed, manufactured, and sold the Firearm, is an Illinois corporation. Complaint at ¶ 18. Defendant Saloom sold the Firearm in retail in Pennsylvania and is a Pennsylvania limited liability company. *Id.* at ¶ 19. The shooting also occurred here in Pennsylvania. A firearm designed and manufactured by an Illinois corporation that was sold and used in Pennsylvania necessarily must have been involved in interstate commerce in some manner. Further, it cannot be disputed, as evidenced by the numerous cases cited within this opinion, that the firearms industry has faced, and will likely continue to face, litigation over its products. Under these circumstances, we determine that it was reasonable for Congress to conclude that these suits would financially impact the firearms industry. *See* 15 U.S.C. § 7901(a)(3) ("Lawsuits have been commenced against manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended, which seek **money damages** and other relief[.]" (emphasis added)). Given this conclusion, we hold it was completely reasonable for Congress to find that these suits "constitute an unreasonable burden on interstate and foreign commerce of the United States[,]" 15 U.S. § 7901(a)(6), and to enact the PLCAA to "prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce." *Id.* at § 7301(b)(4).

Such a finding is inapposite to the Supreme Court's determination in *Lopez* that a portion of the Gun-Free School Zones Act of 1990 making it a federal offense to possess a firearm in a school zone exceeded Congress's Commerce Clause authority. With respect to that act, the Supreme Court was concerned it did not contain a "jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession

in question affects interstate commerce." *Lopez*, 513 U.S. at 561. Similarly, in finding a portion of the Violence Against Women Act (VAWA) that provided a federal civil remedy for victims of gender-motivated violence was outside Congress's Commerce Clause authority, the High Court in *Morrison* expressed concern that Congress did not include a "jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce." *Morrison*, 529 U.S. at 613.

The PLCAA does not contain any similar jurisdictional issues. The Act bars a qualified civil liability action from being brought in federal or state court, *see* 15 U.S.C. § 7902(a), and defines such an action, in relevant part, as a civil action brought "against a manufacturer or seller of a qualified product[.]" *Id.* at § 7903(5)(A). The Act further defines these terms. A manufacturer, in relevant part, is "a person who is engaged in the business of manufacturing the product in interstate or foreign commerce[.]" *Id.* at § 7903(2). A seller is, with respect to a qualified product, an importer of firearms or ammunition, a person engaged in selling or repairing firearms or their parts, or a seller of ammunition who is engaged in interstate or foreign commerce. *Id.* at § 7903(6). Lastly, a qualified product is a "firearm … or ammunition … or a component part of a firearm of ammunition, that has been shipped or transported in interstate or foreign commerce." *Id.* at § 7903(4). As seen from these definitions, Congress carefully crafted the PLCAA to ensure the Act only barred suits that directly involved products and defendants engaged in interstate commerce. These jurisdictional requirements materially distinguish the PLCAA from the more tenuous connections to interstate commerce the Supreme Court found insufficient in *Lopez* and *Morrison*.

The PLCAA's jurisdictional requirements also differentiate the Act from the ACA's individual mandate that the Supreme Court addressed in *Sebelius*, "which requires individuals to purchase a health insurance policy providing a minimum level of

coverage[.]" *Sebelius*, 567 U.S. at 530-31. In addressing the government's argument that the individual mandate fell within Congress's Commerce Clause authority, Chief Justice Roberts, writing only for himself on this issue, observed that the Constitution gives Congress the authority to regulate commerce, which "presupposes the existence of commercial activity to be regulated." *Id.* at 550 (Roberts, C.J.). In finding the Commerce Clause did not authorize the individual mandate, Chief Justice Roberts noted the individual mandate did not regulate existing commercial activity but, instead "compel[led] individuals to *become* active in commerce by purchasing a product, on the ground that their failure to do so affects interstate commerce." *Id.* at 552 (Roberts, C.J.) (emphasis in original). The PLCAA's bar on qualified civil liability actions does not compel similar activity as it only pertains to actions that involve a qualified product, which by definition requires activity in interstate commerce to have already occurred. *See id.* at § 7903(4). Therefore, unlike the individual mandate, the PLCAA does not compel anyone to become active in commerce by purchasing a product but, rather, only applies after a product has already moved in interstate commerce.[14]

---

[14] We further reject Plaintiffs' argument that the PLCAA is not a valid preemption law because it does not regulate individuals or the firearms industry in any manner but rather, regulates only "lawsuits that do not emanate from Congress's preferred source within the state." Plaintiff's Brief at 64. However, as the United States observes, the PLCAA explicitly regulates individuals by barring qualified civil liability actions brought by any "person," which the Act defines as, *inter alia*, "any individual." 15 U.S.C. § 7903(3). Further, while the PLCAA's provision that "[a] qualified civil liability action may not be brought in any Federal or State court," *id.* at § 7902(a), may not initially appear to regulate the firearms industry, Congress need not employ "a particular linguistic formulation" in preempting state law, and thus, "it is a mistake to be confused by the way in which a preemption provision is phrased." *New Jersey Thoroughbred Horsemen's Association v. National Collegiate Athletic Association*, 584 U.S. 453, 478 (2018) (*Murphy*). In analyzing the concept of express preemption, which the PLCAA accomplishes, the Supreme Court in *Murphy* discussed its prior holding in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), which involved the Airline Deregulation Act of 1978 (the Deregulation Act), providing that "no State or political subdivision thereof" could enact or enforce any regulation relating to certain activities of covered airlines. *Id.* at 420 (Stevens, J., (continued…)

## B. Tenth Amendment

The Tenth Amendment states, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. "[T]he Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York v. U.S.*, 505 U.S. 144, 157 (1992). One of these limits is that "Congress may not simply 'commandee[r] the legislative process of the States by directly compelling them to enact and enforce a federal regulatory program." *Id.* at 161 (quoting *Hodel*, 452 U.S. at 288 (brackets provided in *New York*)). This concept is known as the anticommandeering doctrine and "is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." *Murphy*, 584 U.S. at 470.

In *New York*, the Supreme Court found that a federal statute that required states, under certain circumstances, to "take title" to low-level radioactive waste or to "regulat[e] according to the instructions of Congress[]" violated the Tenth Amendment. *New York*, 505 U.S. at 175. The High Court found the statute would either "'commandeer' state governments into the service of federal regulatory purposes" or "command to state

---

dissenting) (quoting the enactment). The *Murphy* Court stated the Deregulation Act may "appear to operate directly on the States," but looking beyond the language "it is clear that this provision operates just like any other federal law with preemptive effect. It confers on private entities (*i.e.*, covered carriers) a federal right to engage in certain conduct subject only to certain (federal) constraints." *Id.* at 478-79. The PLCAA's bar on qualified civil liability actions operates in a similar fashion: it confers on private entities (*i.e.*, firearms manufacturers and sellers) a federal right to engage in interstate commerce subject only to certain (federally allowable) civil suits (*i.e.* exceptions to the bar on qualified civil liability actions). Viewed in this manner, the PLCAA clearly regulates the firearms industry rather than merely the states themselves and, as such, it is a permissible form of express preemption.

governments to implement legislation enacted by Congress[,]" and "the Constitution does not empower Congress to subject state governments to th[at] type of instruction." *Id.* at 175-76. In *Printz v. U.S.*, 521 U.S. 898 (1997), the Court invoked the anticommandeering doctrine to invalidate a portion of the Brady Act that required state and local law enforcement officials to perform background checks and other tasks in relation to handgun license applications, stating

> We held in *New York* that Congress cannot compel the States to enact or enforce a federal regulatory program. Today we hold that Congress cannot circumvent that prohibition by conscripting the State's officers directly. The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.

*Id.* at 935.

More recently, in *Murphy*, the Supreme Court found a federal statute that prohibited states from authorizing sports gambling violated the anticommandeering doctrine. *Murphy*, 584 U.S. at 474. According to the Court, the statute "unequivocally dictate[d] what a state legislature may and may not do" and "state legislatures [were] put under the direct control of Congress." *Id.* According to the Court, it was "as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals. A more direct affront to state sovereignty is not easy to imagine." *Id.* According to the *Murphy* Court, the anticommandeering doctrine bars Congress from both affirmatively commanding states to act and prohibiting state legislatures from acting as "[t]he basic principle – that Congress cannot issue direct orders to state legislatures – applies in either event." *Id.* at 475.

Numerous courts have rejected arguments that the PLCAA violates the Tenth Amendment and the anticommandeering doctrine. According to the Second Circuit in

*City of New York*, "the critical inquiry with respect to the Tenth Amendment is whether the PLCAA commandeers the states." 524 F.3d at 396. That court found the PLCAA did not violate the Tenth Amendment as the Act "does not commandeer any branch of state government because it imposes no affirmative duty of any kind on any of them." *Id.* at 397 (quoting *Connecticut v. Physicians Health Servs. of Conn., Inc.,* 287 F.3d 110, 122 (2d Cir. 2020)). Other courts that have addressed Tenth Amendment challenges to the PLCAA have concurred with the Second Circuit's holding. *See Adames,* 909 N.E.2d at 765 (agreeing with *City of New York*); *Estate of Kim*, 295 P.3d at 389 ("The PLCAA does not *compel* Alaska's legislature to enact any law, nor does it commandeer any branch of Alaska's government." (emphasis in original)); *Delana*, 486 S.W.3d at 323-24 ("The PLCAA does not commandeer the executive or legislative branch of Missouri government …. The PLCAA does not violate the Tenth Amendment."). We agree with these courts that the PLCAA does not command state executive officers to implement federal regulations nor does it direct state legislatures to pass any legislation. The Act merely directs that qualified civil liability actions may not be brought in federal or state court.

Plaintiffs assert the PLCAA's requirement that state courts dismiss cases that are fully supported by state law impermissibly infringes on state sovereignty by commanding state courts to construe state tort law according to Congress's direction. According to Plaintiffs, this command conflicts with *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), because "[t]here is no federal common law. Indeed, Congress has no power to declare substantive rules of common law applicable in a State whether they be local in their nature or 'general,' be they commercial law or part of the law of torts." Plaintiffs' Brief at 55 (quoting *Erie R.R.*, 304 U.S. at 78). Yet, according to Plaintiffs, that is exactly what the PLCAA does as it "is as if federal officers were installed in" the filing offices of every state courthouse

"and were armed with the authority to stop" any gun litigation Congress disfavored." *Id.* (quoting *Murphy*, 584 U.S. at 474).

Plaintiffs' reliance on *Erie R.R.* is misplaced. Prior to the passage quoted by Plaintiffs, the Supreme Court stated, "**[e]xcept in matters governed by the Federal Constitution or by acts of Congress,** the law to be applied in any case is the law of the state." *Erie R.R.,* 304 U.S. at 78 (emphasis added). The PLCAA is such an "act of Congress" that is enforced over applicable state law pursuant to the Supremacy Clause.[15] To the extent the PLCAA requires state judges to dismiss civil actions that could otherwise proceed under state law, that requirement does not violate the anticommandeering doctrine, but is rather a product of the Supremacy Clause. *See New York*, 505 U.S. at 178-79 ("Federal statutes enforceable in state courts do, in a sense, direct state judges to enforce them, but this sort of federal 'direction' of state judges is mandated by the text of the Supremacy Clause."); *see also Delaware County, Pa. v. Federal Housing Finance Agency*, 747 F.3d 215, 228 (3rd. Cir. 2014) ("A state official's compliance with federal law and non-enforcement of a preempted state law – as required by the Supremacy Clause – is not an unconstitutional commandeering.").

As to the anticommandeering doctrine, Plaintiffs rely on *Murphy*, asserting the Supreme Court has made clear that the Tenth Amendment's anticommandeering requirement is not limited to commandeering of state officials. *Murphy*, according to Plaintiffs, rejected the argument that Congress could "prohibit[] states from enacting new law." Plaintiffs' Brief at 53 (quoting *Murphy*, 584 U.S. at 474) (brackets provided by Plaintiffs). Plaintiffs assert that is exactly what the PLCAA does by prohibiting states from

---

[15] "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const Art. VI, cl. 2.

enacting and enforcing new laws recognized through common law rather than through legislation. Plaintiffs' argument in this regard relies on their interpretation of the predicate exception, which they assert "allows states to enforce their tort law in otherwise prohibited lawsuits if the harm was caused by a knowing violation of a statute enacted by the legislature." *Id.* at 50 (citing 15 U.S.C. § 7903(4)(A)(iii)). According to Plaintiffs, if the case *sub judice* claimed that Defendants violated a legislatively passed statute that required the Firearm to be sold with certain safety features or warnings, the PLCAA would permit Pennsylvania courts to impose liability under the predicate exception. Therefore, Plaintiffs contend the PLCAA does not preempt any theory of liability but rather "prevents states from using their judicial branch to establish civil liability standards in certain cases." *Id.* at 51 (emphasis removed). The United States counters that nothing in the PLCAA prohibits state courts from altering or creating common law or from interpreting state statutes, as it does not "foreclose[] the possibility" that state court interpretations of state legislation may bear on whether a state law falls within the PLCAA's exception. United States' Brief at 20 (quoting *City of New York*, 524 F.3d at 396).

Plaintiffs' reliance on *Murphy* fails for a simple reason: the PLCAA does not bar states from enacting any law and instead merely preempts state law in relation to qualified civil liability actions. The predicate exception does nothing to alter this conclusion. Rather, the exception merely excuses from the general definition of a qualified civil liability action "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm which relief is sought[.]" 15 U.S.C. § 7903(5)(A)(iii). Unlike the statute at issue in *Murphy*, the predicate exception does not "dictate[] what a state legislature may and may not do." *Murphy*, 584 U.S. at 474. The PLCAA does not contain any language comparable to the statute at issue in *Murphy* that

declared it to be unlawful for states to authorize sports gambling. Under the PLCAA state legislatures remain free to pass any statute they deem appropriate, while the predicate exception does not limit states' ability to recognize new causes of action through common law. Nor does the predicate exception prohibit states from interpreting state statutes through their courts. *See City of New York*, 524 F.3d at 396 (reflecting court would not "construe the PLCAA as foreclosing the possibility that predicate statutes can exist by virtue of interpretations by state courts."). Thus, the predicate exception simply carves out civil actions alleging certain knowing violations of state or federal statutes from the Act's general definition of a qualified civil liability action. States remain free, either through their legislatures or their courts, to recognize any cause of action they deem appropriate. All the PLCAA, including the predicate exception, does is preempt certain causes of actions involving the firearms industry.

Plaintiffs further assert the PLCAA, through the predicate exception, violates the Tenth Amendment and federalism principles by impermissibly intruding on states' lawmaking authority and infringing on their sovereign right to allocate their lawmaking powers as they see fit. Plaintiffs contend the authority of states to make law through their courts is a core aspect of their sovereignty and Congress does not have authority to determine what branch of state government is used to make state law. Plaintiffs Brief at 49 (citing *Erie R.R.*, 304 U.S. at 78). According to Plaintiffs, through the predicate exception, Congress essentially determined that states are required to enact laws regulating the firearms industry though their legislatures rather than their courts. In this sense, Plaintiffs analogize the PLCAA to the New York Court of Appeals decision in *In re Vargas*, 131 A.D.3d 4 (N.Y. App. Div, 2nd Dep't 2015), where the court, in addressing a federal statute regarding the granting of professional licenses to undocumented immigrants, stated "[t]he ability, indeed the right of the states to structure their

governmental decision-making process as they see fit is essential to sovereignty protected by the Tenth Amendment." Plaintiffs' Brief at 53 (quoting *Vargas*, 131 A.D.3d at 24.). In addition to the arguments made in their brief on this issue, Plaintiffs also adopt the arguments made by their *amicus* Federalism Scholars, a group of constitutional law professors. *See* Federalism Scholars Brief at 1. According to *amici,* the PLCAA impermissibly intrudes on states' ability to allocate their law-making authority between their legislatures and courts, through the predicate exception and concludes "[a] congressional enactment, like [the] PLCAA that denies state court authority to declare state law and requires instead exclusive reliance on legislatures for the definitive pronouncement of that state's law invades the core of state sovereignty." *Id.* at 24 (citing *Alden v. Maine*, 527 U.S. 706, 751 (1999)).

In response the United States asserts the Supreme Court has never recognized this novel theory that a federal statute violates the Tenth Amendment by infringing on a state's decision of which branch of government it chooses to make law. *See* United States' Brief at 19. On the other hand, the government argues, the Supreme Court has explicitly rejected arguments that "general principles of federalism place some areas of state authority beyond the reach of a validly enacted Act of Congress." *Id.* at 21 (citing *Hodel*, 452 U.S. at 276; *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550 (1985)). In their reply brief, Plaintiffs assert the United States is incorrect in asserting that the Supreme Court has never recognized that state's decision on which branch of government it chooses to make law violates the Tenth Amendment as the Court has recognized that "the States are free to allocate the lawmaking function to whatever branch of state government they may choose." Plaintiffs' Reply Brief at 6 (quoting *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 461n.6 (1981)).

Initially, we find Plaintiffs' reliance on *Erie R.R.* unpersuasive. *Erie R.R.* simply stands for the proposition that "[t]here is no federal general common law." 304 U.S. at 78. Under *Erie R.R.*, states are free to make their own common law "provid[ed] there is no overriding federal rule which pre-empts state law by reason of federal curbs on trading in the stream of commerce." *Lehman Bros. v. Schein*, 416 U.S. 386, 389 (1974). As the PLCAA has explicitly preempted state tort law in regard to qualified civil liability actions, we find *Erie R.R.* does not impact our Tenth Amendment analysis.

Next, as a New York state intermediate appellate court decision, *Vargas* is clearly not binding on this Court and, to the extent it would have any persuasive value, we do not find the case instructive. *Vargas* involved a federal statute "which generally prohibits the issuance of state professional licenses to undocumented immigrants unless an individual state has enacted legislation affirmatively authorizing the issuance of such license." *Vargas*, 131 A.D.3d at 6. In addressing an undocumented immigrant's application for admission to the New York State bar, the intermediate appellate court found the statute violated the Tenth Amendment to the extent it required the state legislature to act in order to grant an individual admission to the bar, rather than the court. The court's focus was not on the statute in general but rather "solely" on the impact it had on the judicial branch's decision to grant licenses to practice law, and the court emphasized "that the Tenth Amendment concerns implicated here by the issuance of law licenses do not exist in regard to the issuance of other types of professional licenses by other arms of the state's government." *Id.* at 27. Clearly, by its own terms, *Vargas* does not impact Tenth Amendment analysis to circumstances outside the limited arena of the judiciary's granting of bar admissions, which the PLCAA clearly does not implicate.

Even if the analysis in *Vargas* was applicable, the statute at issue there is easily distinguishable from the PLCAA. As the district court aptly explained in *Travieso*

> unlike the statute at issue in *Vargas*, the PLCAA does not simply allow states to "opt out" and allow tort claims as long as the legislature creates them. While the statute's restrictions in *Vargas* became inoperative as soon [as] the legislature acted, the PLCAA preempts tort actions regardless of what branch creates them. It does not matter if they are developed by the court or codified by the legislature.

*Travieso*, 526 F. Supp.3d at 551 (internal citations omitted).

As the *Travieso* Court implies, nothing in the PLCAA, and specifically the predicate exception, dictates to states what branch of government can pass laws. States remain free to enact new laws either through their legislatures or develop legal doctrines at common law through their courts. All the PLCAA does is preempt certain civil actions regardless of what branch of state government has created them. The predicate exception does not alter this structure but merely exempts claims raising certain specific statutory violations from the general definition of a qualified civil liability action. This exception has no impact on how states choose to allocate their lawmaking authority.

Assuming Plaintiffs and the Federalism Scholars are correct that the federal government does not have authority to dictate to states which branch of their government shall enact certain laws, we agree with the United States that that principle is not applicable to the PLCAA. *See* United States Brief at 19. The reason, as explained above, is straightforward: nothing in the PLCAA dictates to the states which branch of government they can use to enact any laws.[16] The Act merely bars certain civil actions from being brought. The predicate exception does not alter this conclusion as the exception merely excludes certain statutory based claims from that general bar. States

---

[16] Twenty states have either filed or joined *amicus* briefs in this matter. None of those states have argued the PLCAA unconstitutionally infringes on their sovereignty by dictating which branch of their respective governments they choose to enact laws. *See* Brief of State of Montana (joined by eighteen other states) and Brief of Commonwealth of Pennsylvania (takes no position of the Act's constitutionality).

remain free to enact any law they wish through any branch of government they wish without any restriction from the PLCAA.

## IV. Conclusion

Plaintiffs' action is a qualified civil liability action pursuant to the PLCAA and does not qualify under the Act's product liability exception. As such, the PLCAA operates to bar Plaintiffs' action. Further, the PLCAA is a valid exercise of Congress's Commerce Clause authority and does not violate the Tenth Amendment or principles of federalism. We therefore vacate the Superior Court's *per curiam* order reversing the trial court and remand for reinstatement of the trial court's order sustaining Defendants' preliminary objections in the nature of demurrer.

Chief Justice Todd and Justices Donohue, Dougherty, Wecht and Brobson join the opinion.

Justice McCaffery did not participate in the consideration or decision of this matter.